IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHELTER FOREST INTERNATIONAL                               Case No. 3:19-cv-01259-JR
ACQUISITION, INC., an Oregon Corporation,
                                                           OPINION AND ORDER
              Plaintiff,

        v.

COSCO SHIPPING (USA) INC., a Delaware
Corporation; COSCO SHIPPING LINES
(NORTH AMERICA) INC., a Delaware
Corporation; COSCO SHIPPING TERMINALS
(USA) LLC, a Delaware LLC; RUDY ROGERS,
an individual; COSCO SHIPPING LINES CO.,
LTD.; and JANE AND JOHN DOES NOS. 1-3,

              Defendants.
_____

RUSSO, Magistrate Judge:

        Shelter Forest International Acquisition, Inc. ("SFI") filed this action against defendants

COSCO Shipping (USA) Inc., COSCO Shipping Lines (North America) Inc., COSCO Shipping

Terminals (USA) LLC, Rudy Rogers, and COSCO Shipping Lines Co., Ltd. ("CSL") alleging

multiple contractually-based claims under state law.[1] All parties have consented to allow a

Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P.

73 and 28 U.S.C. § 636(c). CSL now moves for partial summary judgement, pursuant to Fed. R.

Civ. P. 56, as to one of its two breach of contract counterclaims. CSL also seeks summary judgment

on SFI's claims on the basis that they are untimely under the Carriage of Goods at Sea Act

("COGSA"), 46 U.S.C. § 30701 et seq. For the reasons stated below, CSL's motions are granted.

_____
[1] All parties except CSL were subsequently voluntarily dismissed.

Page 1 – OPINION AND ORDER

## BACKGROUND

This case hinges on the terms of three separate contracts between the parties: a service contract, designated LAI18634 ("Service Contract"); and two separate but substantively identical bills of lading, designated COSU6179362350 and COSU6185400200, concerning the "Portland Shipment" and the "Chippewa Falls Shipment," respectively.[2]

CSL is a shipping company based in China operating a fleet of oceangoing containerships that transport cargo internationally, including between China and the United States. SFI is an Oregon corporation that imports and distributes lumber, plywood, and other building materials. The parties entered into the Service Contract in April 2018. See generally Zhang Decl. Ex. 1 (doc. 29-1). The Service Contract provided that CSL would guarantee SFI a specified freight rate in exchange for SFI's promise to ship a minimum volume of cargo on CSL's vessels over the course of the contractual term.

Specifically, Term 1 of the Service Contract included a minimum quantity provision ("MQP"), which required SFI to ship 5,000 Twenty-Foot Equivalent Containers ("TEUs") between May 1, 2018, and April 30, 2019. Id. at 13. Under Term 2, CSL promised to provide adequate and assured vessel space to carry the minimum quantity of cargo, with at least three regularly scheduled sailings per month. Id. Should CSL fail to furnish space on a specific sailing,

---

[2] A "service contract" is a written contract between one or more shippers and ocean common carriers, or an agreement between or among ocean common carriers, in which: the shipper commits to providing a certain volume or portion of cargo over a fixed time period, and the carrier or agreement commits to a certain rate or rate schedule and a defined service level (such as assured space, transit time, port rotation, or similar service features). 46 U.S.C. § 40102(21). A service contract must be filed with the Federal Maritime Commission and include certain terms. 46 U.S.C. § 40502(b), (d). A bill of lading, in contrast, is a written contract that "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004).

SFI had the option to "apply for guaranteed space on one or more specific sailings by submitting a written request to [CSL] at least 10 days before the earliest scheduled departure of a vessel upon which guaranteed space is requested." Id. at 14.

If SFI failed to fulfill the MQP, Term 5 of the Service Contract provided that CSL was entitled to liquidated damages, unless SFI's failure was excused by one of three specified conditions. Id. at 16. First, SFI had the option to reduce the minimum quantity of shipments if CSL did not provide vessel space for cargo tendered in good order. Id. at 13. Second, CSL could cancel the Service Contract by written notice to SFI after the MQP was fulfilled. Id. at 17. Finally, the force majeure provision excused either party's performance if "prevented by acts of god, strikes, embargoes, or events similarly beyond the knowledge or control of either party, but not including commercial contingencies." Id.

Otherwise, the Service Contract would terminate upon assignment, completion, or expiration. Id. at 17-18. CSL expressly retained the right to strictly enforce the terms of the Service Contract, unless formally excused by mutual written consent:

> No failure by either [CSL] or [SFI] to demand the strict and literal performance of or compliance with any provision, condition, or requirement herein shall be deemed to be a waiver thereof, or of strict and literal performance of and compliance with any other provision, condition, or requirement herein, nor to be a waiver of, or in any manner release such other party from, strict compliance with any provision, condition, or requirement in the future. No waiver hereunder shall be enforceable unless in writing and signed by the party against whom enforcement is sought.

Id. at 20.

In regard to three previous service contracts, the parties filed formal amendments of the minimum quantity requirements with the Federal Maritime Commission ("FMC"). Rogers Decl. ¶¶ 7-8 (doc. 31). There is no evidence in the record that CSL agreed to waive SFI's performance under the Service Contract at issue or modify the MQP.

Page 3 – OPINION AND ORDER

Disputes over two separate shipments gave rise to the present action. Zhang Decl. ¶ 5 (doc. 29). Each of these shipments was booked under the Service Contract, as well as an individual bill of lading, which incorporated CSL's standard terms and conditions and set out the particulars for the respective shipments. Id. at ¶ 6. These terms and conditions appear on the backside of every one of CSL's bills of lading and are also published as part of CSL's tariff of general applicability, which is filed with the FMC. Id.; see generally Zhang Decl. Ex. 2 (doc. 29-2). Accordingly, CSL's standard terms and conditions are publicly available through the FMC and CSL's website. Zhang Decl. ¶¶ 4, 6 (doc. 29).

Several of CSL's terms and conditions expressly subject contracts for the carriage of goods to COGSA. For instance, Clause 26(2) provides:

> where carriage includes carriage to or from or through a port or place in the United States of America, this Bill of Lading shall be subject to the provisions of the US COGSA, which shall be deemed to have been incorporated herein and nothing herein contained shall be deemed a surrender by [CSL] of any of its rights, immunities, exceptions or limitations or an increase of any of its liabilities under US COGSA . . . COGSA (except as may be otherwise specifically provided herein) shall also govern before loading and after discharging as long as the goods remain in [CSL's] custody of control.

Zhang Decl. Ex. 2, at 44-45 (doc. 29-2); see also id. at 36 (same). Likewise, the "NOTICE OF CLAIM AND TIME BAR" provision incorporates COGSA's limitation on the time to bring suit: "[CSL] shall be discharged from all liabilities whatsoever unless suit is brought within one year after delivery of the Goods or the date when the Goods should have been delivered." Id. at 35. Finally, the "LOSS OR DAMAGE" provision makes clear that CSL's responsibilities relating to any shipment are limited to those specified by contract:

> The terms of this Bill of Lading shall at all times govern all responsibilities of [CSL] in connection with or arising out of the carriage of the Goods not only during the carriage, but also during the period prior to and/or subsequent to the carriage. The exemptions from liability, defenses and limitation of liability provided for herein

Page 4 – OPINION AND ORDER

or otherwise shall apply in any action against [CSL] for loss or damage or delay, howsoever occurring and whether the action be founded in contract or in tort and even if the loss, damage or delay arose as a result of unseaworthiness, negligence or fundamental breach of contract.

Id.

The first incident, the Portland Shipment, was booked in April 2018 by SFI's affiliate, Xuzhou Shelter, who also was responsible for packing the containers.[3] Zhang Decl. ¶¶ 7, 9 (doc. 29). As a result, the bill of lading for the Portland Shipment identified Xuzhou Shelter as the shipper and SFI as the consignee. Zhang Decl. Ex. 3, at 2 (doc. 29-3). Xuzhou Shelter requested, and CSL agreed, to "telex release" the bill of lading to SFI's associate in China. Zhang Decl. ¶ 8 & Ex. 4 (doc. 29-4); Second Henry Decl. ¶ 2 & Ex. 1 (doc. 47).

A dispute arose when SFI's cargo, destined for Portland, Oregon, was damaged in a rollover accident. Zhang Decl. ¶¶ 10-12 (doc. 29). The parties disagree as to the cause of the accident – i.e., CSL's negligent driving or SFI's failure to properly load the container. Compare Zhang Decl. Ex. 6, at 5-7 (doc. 29-6), with Macy Decl. ¶ 4 (doc. 44). In any event, the cargo was delivered to Portland on May 23, 2018, and CSL made it available to SFI for pick-up upon payment for container damage and cargo transloading charges. Zhang Decl. ¶ 13 & Ex. 7 (doc. 29-7). The parties were unable to resolve fault for the damage to SFI's cargo and CSL's container, such that CSL continued to hold the cargo in the container yard and began charging demurrage (i.e., storage fees) on June 2, 2018. Zhang Decl. ¶ 13 (doc. 29); Macy Decl. ¶ 8 (doc. 44).

---

[3] Under the bill of lading, CSL is "not to be liable for loss of or damage to the Goods" where it does not pack the containers and SFI "shall indemnify [CSL] against any loss, damage, liability or expense incurred by [CSL] if such loss, damage, liability or expense has been caused by . . . the manner in which the Container has been filled, packed, loaded or stuffed." Zhang Decl. Ex. 2, at 37 (doc. 29-2).

The second incident, the Chippewa Falls Shipment, was also booked in April 2018 pursuant to an original bill of lading and "telex" release. Zhang Decl. ¶¶ 15-16 & Exs. 8-9 (doc. 29); Second Henry Decl. ¶ 3 & Ex. 2 (doc. 47). An SFI affiliate in China arranged to have cargo shipped directly to Chippewa Falls, Wisconsin. Bennett Decl. ¶ 2 (doc. 41); Macy Decl. ¶ 14 & Ex. A (doc. 44). SFI was responsible for confirming that the shipment was directed to the proper port. Third Henry Decl. Ex. 2, at 8-10 (doc. 62). Issues with routing due to the cargo's weight prevented a direct delivery to the scheduled destination, such that SFI's affiliate agreed to amend the bill of lading to allow rerouting to St. Paul, Minnesota, approximately 90 miles from Chippewa Falls.[4] Bennett Decl. ¶ 2 (doc. 41); Zhang Decl. ¶ 17 & Ex. 10 (doc. 29-10). This rerouting resulted in a significant delay that negatively impacted SFI's relationship with a major client. Macy Decl. ¶ 31 (doc. 44). SFI picked up the Chippewa Falls Shipment in St. Paul on June 12 and 14, 2018, and it was delivered to the client on June 29, 2018. Zhang Decl. ¶ 18 & Ex. 11 (doc. 29-11); Macy Decl. ¶¶ 25, 31 (doc. 44). Again, the parties disagree over who was responsible for the routing issues and associated delay and costs.

SFI subsequently discontinued shipping its cargo with CSL, such that during the contractual term it only shipped 2,342 of the requisite 5,000 TEUs. Henry Decl. Ex. D, at 25 (doc 30-4). SFI received its last shipment from CSL on July 9, 2019. Suppl. Macy Decl. ¶ 6 (doc. 57).

---

[4] Under these circumstances, CSL's term and conditions required SFI to bear the cost of transport: "If it appears at anytime that the Goods cannot safely or properly be carried or carried further, either at all or without incurring any additional expense or taking any measure(s) in relation to the Goods or the Container, [CSL] may without notice to [SFI] take any measure(s) and/or incur any additional expense to carry or to continue the carriage thereof, and/or dispose of the Goods, and/or abandon the carriage and/or store them ashore or afloat, under cover or in the open, at any place, whichever [CSL in its] absolute discretion considers most appropriate, which abandonment, storage or disposal thereof shall be deemed to constitute due delivery under this Bill of Lading. [SFI] shall indemnify [CSL] against any additional expense so incurred." Zhang Decl. Ex. 2, at 39-40 (doc. 29-2); see also id. at 41.

Page 6 – OPINION AND ORDER

On July 10, 2019, SFI initiated this action in Multnomah County Circuit Court. Notice of Removal Ex. A (doc. 1-1). In August 2019, CSL removed SFI's complaint to this Court on the basis of diversity jurisdiction. Later that month, SFI filed its First Amended Complaint alleging common law claims for negligence, conversion, breach of contract, and misrepresentation, as well as a statutory claim under Oregon's Unfair Trade Practices Act ("UPTA"), and seeking damages in excess of one million dollars. See generally First Am. Compl. (doc. 8). In October 2019, CSL asserted two counterclaims for breach of contract, one relating to the MQP and the other relating to Xuzhou Shelter's negligent packing of the Portland Shipment. See generally Answer (doc. 17).

On April 2 and May 4, 2020, CSL filed the present summary judgment motions. Briefing on those motions was completed on June 29, 2020.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

CSL's motions pose two essential questions: whether the MQP is unambiguous and whether COGSA's statute of limitations applies to preclude some or all of SFI's claims. If either of these questions are answered in the affirmative, the Court must then resolve whether any of the myriad excuses /defenses invoked by SFI are applicable.

## I.    CSL's Counterclaim

CSL asserts that summary judgment is warranted in regard to its counterclaim because SFI breached the Service Contract by failing to fulfill the MQP and has no valid excuse for nonperformance. Def.'s Mot. Partial Summ. J. 9-10 (doc. 28).

Conversely, SFI argues that they did not breach the MQP because the parties, through their course of dealing, intended the term "minimum" to actually mean "target." Pl.'s Resp. to Mot. Partial Summ. J. 8-10 (doc. 39). Alternatively, SFI contends that any breach of the MQP was precipitated and excused by CSL's prior material breaches. Id. at 29-33. Regardless of whether CSL materially breached the Service Contract, SFI also maintains its performance was excused by the existence of force majeure conditions, as well as supervening impossibility. Id. at 34-35.

### A.    Interpreting the MQP

The parties agree that the Service Contract is a maritime contract because the primary objective was the transportation of goods by sea. See, e.g., Norfolk, 543 U.S. at 24. Although a maritime contract's "interpretation may so implicate local interests as to beckon interpretation by

Page 8 – OPINION AND ORDER

state law," where state interests "cannot be accommodated without defeating a federal interest[,] federal substantive law should govern." Id. at 23; see also F.W.F., Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342, 1356 (S.D. Fla. 2007) (applying "general federal maritime law" to interpret a maritime contract because the parties did not articulate any specific state interest at stake). Disputes over maritime contracts may also be governed by state law in the same manner as nonmaritime contracts if state law does not clearly conflict with federal law. Aqua-Marine Constructors, Inc. v. Banks, 110 F.3d 663, 667-68 (9th Cir. 1997).

CSL asserts that the Court should apply federal maritime law, arguing that the MQP is unambiguous and, by extension, any extrinsic evidence is irrelevant. Def.'s Reply to Mot. Partial Summ. J. 5-6 (doc. 55). SFI contends Oregon law governs and that the Court should look to extrinsic evidence, and conclude that the term "minimum" was intended by the parties to mean "target" or "actual" regarding the volume commitment. Pl.'s Resp. to Mot. Partial Summ. J. 22-26 (doc. 39). To support its interpretation of the MQP as an aspirational target, as opposed to a minimum requirement, SFI points to the parties' discussions, which suggest that the specified TEUs were more like a "reserve" figure so that CSL could ensure ample space on its vessels for SFI's cargo. Id. SFI also points to its prior course of dealing with CSL, including agreements in previous years to amend the MQP at the end of their contractual term to reflect the number of TEUs SFI actually shipped on CSL vessels. Id.

Irrespective of whether federal or state law controls, the result is the same. Under federal law, to establish a claim for breach of contract, the plaintiff must prove "(1) the terms of a maritime contract, (2) that the contract was breached, and (3) the reasonable value of the purported damages." Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1249 (11th Cir. 2005) (citing Exxon Corp. v. Cent. Gulf Lines, Inc., 500 U.S. 603, 605-06 (1991)). Likewise, under

Oregon law, to establish a claim for breach of contract, the plaintiff must prove "the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." Slover v. Or. State Bd. of Clinical Soc. Workers, 144 Or.App. 565, 570, 927 P.2d 1098 (1996) (citation and internal quotations omitted).

Furthermore, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." Norfolk, 543 U.S. at 31. The parol evidence rule is a substantive rule of contract law. Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir.1988). In admiralty, the parol evidence rule is generally stated as follows:

> When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

Id. (citation and internal quotations omitted). "[W]hen the obligations are not clearly stated – when they are ambiguous – the parol evidence rule does not prevent the introduction of extrinsic evidence to aid in interpretation of the contract." Id. at 27. As such, the court is "required to determine as a question of law whether the terms of the contract were sufficiently ambiguous to permit any proof concerning the subjective intent of the parties." Nat'l Util. Serv., Inc. v. Whirlpool Corp., 325 F.2d 779, 781 (2d Cir. 1963).

Oregon law is consistent. In interpreting a contract under Oregon law, the court employs a three-step analysis. Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997) (citations omitted). First, the court determines whether the contractual provision is ambiguous. Batzer Const., Inc. v. Boyer, 204 Or.App. 309, 315, 129 P.3d 773, rev. denied, 341 Or. 366, 143 P.3d 239 (2006) (citations omitted). A contractual term is ambiguous "if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation." Id. at 313 (citation and internal

Page 10 – OPINION AND ORDER

quotations omitted). For potentially ambiguous or flexible terms, the court considers the text and context, as well as the circumstances surrounding the contract's creation, including "the parties' precontract negotiations." Id. at 316-20 (citations omitted); see also State v. Heisser, 350 Or. 12, 25, 249 P.3d 113 (2011) ("[w]hen considering a written contractual provision, the court's first inquiry is what the words of the contract say, not what the parties say about it") (citation and internal quotations omitted). "The court must, if possible, construe the contract so as to give effect to all of its provisions." Williams v. RJ Reynolds Tobacco Co., 351 Or. 368, 379, 271 P.3d 103 (2011).

Second, if the text, context, and circumstances of formation evince ambiguity, the court evaluates extrinsic evidence of the contracting parties' intent. Batzer, 204 Or.App. at 316-17 (citations omitted). If the "provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction" to determine the provision's meaning. Yogman, 325 Or. at 364.

Service contracts are governed by federal statute and are subject to the FMC's regulatory framework. 46 U.S.C. § 40502; 46 C.F.R. §§ 530.1, 530.3(e). The parties to a service contract are required to file that document and any subsequent amendments with the FMC. 46 C.F.R. §§ 530.5, 530.10(b). A service contract must include a minimum quantity or portion provision and liquidated damages clause in case of nonperformance. 46 U.S.C. §§ 40502(c)(4), 40502(c)(8); 46 C.F.R. §§ 530(b)(4), 530.8(b)(7). These essential terms may not be "uncertain, vague, or ambiguous." 46 C.F.R. § 530.8(c)(1).

Here, the Court finds the MQP unambiguous, especially given the commercial significance of service contracts as well as the federal government's interest in regulating them. Indeed, the Service Contract plainly states: "[SFI] agrees to tender to [CSL], or cause to be tendered to [CSL],

Page 11 – OPINION AND ORDER

a minimum of . . . 5,000 TEU[s]." Zhang Decl. Ex. 1, at 13, 22 (doc. 29-1). No other provision

alters or amends that term. See generally id. Moreover, no word or phrase in the MQP is inherently

flexible or open to more than one reasonable interpretation. See Heisser, 350 Or. at 25 (courts "first

examine the text of the disputed provision . . . [if] clear, the analysis ends") (citation and internal

quotations and brackets omitted); see also Batzer, 204 Or.App. at 19-20 (turning to extrinsic

evidence regarding the parties' contract negotiations and prior course of dealing only after

determining that the term at issue was open to more than one reasonable interpretation); Van Atta

v. Stephanie Fry, Inc., 295 Or.App. 465, 473, 434 P.3d 975 (2018) ("extrinsic evidence [of the

circumstances underlying the contract] may only affect interpretation when there is language in

the instrument that is susceptible to being construed to carry out the proposed intent") (citation and

internal quotations omitted).[5]

  Finally, in light of the Service Contract's non-waiver provision (which allows CSL to

strictly enforce the MQP even if it previously did not do so) and the liquidated damages provision

(which allows CSL to seek damages if SFI fails to ship the minimum TEUs), the parties' prior

course of dealing does not introduce ambiguity into the MQP. To find otherwise would render

other provisions meaningless. Therefore, because the obligations of the parties are clearly stated,

consideration of extrinsic evidence is both unhelpful and improper.

---

[5] SFI asserts that, under Batzer, and Oregon law more generally, the Court is required to consider
extrinsic evidence of the parties' intent, even in the absence of vague or flexible language. Pl.'s
Resp. to Mot. Partial Summ. J. 24-25 (doc. 39). But Oregon law is to the contrary: it is axiomatic
that unequivocal terms must be read in accordance with their plain meaning. Heisser, 350 Or. at
25-28. In any event, even if SFI's proffered interpretation of Batzer were correct, a conflict would
exist between state and federal law, in which case federal law controls and extrinsic evidence
would be excluded. Norfolk, 543 U.S. at 31; Garza, 861 F.2d at 26-27.

Accordingly, SFI's concession that it did not meet the MQP during the term of the Service Contract, providing "approximately" 2,342 TEUs of the agreed 5,000 TEUs, is dispositive unless a valid excuse for nonperformance exists. Henry Decl. Ex. D, at 25 (doc 30-4); Rogers Decl. ¶ 7 (doc. 31).

### B.    CSL's Alleged Breaches

SFI asserts CSL materially breached the Service Contract in four respects, thereby excusing its nonperformance. First, SFI argues that the Portland Shipment constituted a material breach because CSL damaged SFI's cargo. Pl.'s Resp. to Mot. Partial Summ. J. 30-31 (doc. 39). Second, SFI contends the Chippewa Falls Shipment constituted a material breach because CSL's decision to leave SFI's cargo in St. Paul caused a significant delay and the loss of one of SFI's major clients. Id. at 31-33. Third, according to SFI, CSL's rejection of SFI's cargo "at least 25 separate times" constituted a material breach. Id. at 26. Fourth, SFI argues that CSL's revocation of SFI's credit terms while SFI's cargo was being transported on CSL vessels constituted a material breach. Id. at 33.

CSL points to numerous contractual provisions to support its assertion that none of these events qualify as a breach of the Service Contract, much less a material breach. Def.'s Mot. Partial Summ. J. 12-18 (doc. 28). According to CSL, issues surrounding the Portland and Chippewa Falls Shipments are governed by the applicable bills of lading, not the Service Contract; because these are distinct contracts, in that breach of one does not excuse nonperformance of the other. Id.

A material breach or nonperformance of a promise by one party to a bilateral contract may discharge the nonbreaching party's own contractual duty. Wasserburger v. Am. Sci. Chem, Inc., 267 Or. 77, 82, 514 P.2d 1097 (1973). "A breach is material if it goes to the very substance of the contract and defeats the object of the parties in entering into the contract." Bisio v. Madenwald, 33

Page 13 – OPINION AND ORDER

Or.App. 325, 331, 576 P.2d 801 (1978); see also Venture Props. v. Parker, 223 Or.App. 321, 353–54, 195 P.3d 470 (2008) (defining criteria used to assess materiality) (citation omitted).

Likewise, under federal law, a material breach of contract may discharge the nonbreaching party's further performance under the contract. Zim Israel Navigation Co. v. Indonesian Exps. Dev. Corp., 1993 WL 88223, *2 (S.D. N.Y. Mar. 24, 1993). "To justify rescission, the breach must be so significant that the purpose of the contract is defeated by the breach." Id. (citing U.S. Plywood Corp. v. Hudson Lumber Co., 113 F.Supp. 529, 534 (S.D. N.Y. 1953)). "A similar test is used in maritime law to determine whether a party's conduct constitutes a 'deviation' from the contract." Id. at *3. "A party to a maritime contract may be relieved of the obligations under the contract if he deviates from it or breaches the contract in a way that goes to the essence of the contract." Id.

### i.    The Portland and Chippewa Falls Shipments

SFI and CSL dispute which party is to blame for the rollover accident which resulted in damage to SFI's cargo and to CSL's container during the Portland Shipment, and the misrouting of the Chippewa Falls Shipment which resulted in a significant delay of SFI's goods. As a matter of law, however, these disputes are not material because neither represents a violation of the Service Contract nor a breach excusing SFI's nonperformance.

Critically, "misdelivery or nondelivery of goods under a maritime contract has not been considered a breach so fundamental to the contract as to constitute a deviation." Zim Israel, 1993 WL 88223 at *3; see also Sedco, Inc. v. S.S. Strathewe, 800 F.2d 27, 32 (2d Cir. 1986) ("a failure to properly handle, stow, care, or deliver cargo, never has constituted deviation"); Hellyer v. Nippon Yesen Kaisya, 130 F.Supp. 209, 211 (S.D. N.Y. 1955) (nondelivery of goods under a contract is not "such a fundamental breach as to vitiate the contract between the parties," but rather

Page 14 – OPINION AND ORDER

is "a risk within the contemplation of the [contracting] parties") (citations omitted); B.M.A. Indus. v. Nigerian Star Line, 786 F.2d 90, 91 (2d Cir. 1986) (per curiam) (misdelivery of goods does not constitute a deviation).

Stated differently, courts have consistently declined to find unreasonable delay, or even nondelivery resulting from the carrier's negligence, to constitute a deviation, and this Court sees no reason to depart from well-established authority. Thus, neither the damage to SFI's cargo in the Portland Shipment nor the delay in the Chippewa Falls shipment due to misrouting excuse SFI's nonperformance of the MQP. See Zim Israel, 1993 WL 88223 at *3 ("[b]oth vitiating a contract's terms and forgiving further performance under a contract yield harsh results to a carrier and both should therefore be allowed only for the most significant breaches").

This is especially true considering that the Service Contract does not address liability for damage or delay. Bills of lading and service contracts are treated as distinct agreements: "service contracts govern only claims for breach of their pricing and shipping provisions," and do not extend to "claims for cargo damage," which are covered by bills of lading. Regal-Beloit Corp. v. Kawasaki Kisen Kaisha, Ltd., 462 F.Supp.2d 1098, 1105 (C.D. Cal. 2006). "[N]or do [service contracts] modify the terms and conditions set forth in the Bills of Lading." Id. Even if CSL breached the Portland or Chippewa Falls Shipment bill of lading by causing damage to or delay of SFI's goods during transport, neither would excuse SFI's failure to fulfill the Service Contract.

In fact, under the terms of the bills of lading, SFI agreed CSL would not be liable for damage to SFI's goods. Specifically, Term 6(1) reads:

> The exemptions from liability, defenses and limitation of liability provided for herein or otherwise shall apply in any action against [CSL] for loss or damage or delay, howsoever occurring and whether the action be founded in contract or in tort and even if the loss, damage or delay arose as a result of unseaworthiness, negligence or fundamental breach of contract. Save as is otherwise provided herein,

Page 15 – OPINION AND ORDER

> [CSL] shall in no circumstances whatsoever and howsoever arising be liable for direct or indirect consequential loss or damage or loss of profits.

Zhang Decl. Ex. 2, at 35 (doc. 29-2). Nor did CSL promise SFI timely delivery of its goods: "[CSL] does not undertake that the Goods will be transported from or loaded at the place of receipt or loading or will arrive at the place of discharge, destination or transshipment aboard any particular vessel or other conveyance at any particular date or time or to meet any particular market or in time for any particular use." Id. As such, SFI's arguments related to the Portland and Chippewa Shipments are not persuasive.

### ii.    CSL's Rejection of SFI Shipments

Via Term 2(f) of the Service Contract, CSL expressly reserved the right to reject shipments and provided SFI a mechanism for reserving cargo space on specific vessels upon CSL's rejection. Zhang Decl. Ex. 1, at 14 (doc. 29-1). SFI alleges that CSL rejected its shipments on 25 separate occasions but provides no details surrounding these events. More importantly, SFI does not provide any evidence indicating that it invoked its right under Term 2(f) to apply for guaranteed space. Given the facts before it, the Court cannot conclude that CSL's alleged rejection of SFI shipments constitutes a material breach that would excuse SFI's subsequent nonperformance.

### iii.    CSL's Revocation of SFI's Credit Terms

CSL also expressly reserved the right to revoke SFI's credit terms in the event that SFI failed to pay freight charges. Term 8.102 provides:

> [SFI] understands that this provision does not exempt [SFI] from [CSL]'s normally applicable credit practices with respect to release of individual shipments, as specified in the tariff of general applicability. [CSL] reserves the right to deem this contract breached and to terminate the contract if charges under the contract are due and unpaid for more than sixty days.

Id. at 17. SFI admits to withholding payment "on another shipment, as a means of a partial offset of its losses due to [CSL]'s" alleged breaches regarding the Portland and Chippewa Falls Shipments. Pl.'s Resp. to Mot. Partial Summ. J. 18 (doc. 39). In response, on March 13, 2019, CSL invoked its right under Term 8.102 to suspend SFI's credit terms, demanding payment for all outstanding charges before releasing SFI's cargo. Bennett Decl. ¶¶ 2-8 (doc. 41). Because CSL's suspension of SFI's credit terms was expressly contemplated by the Service Contract under the aforementioned circumstances, no breach occurred.

### C.    Force Majeure or Supervening Impossibility

Finally, SFI argues that its nonperformance is excused by both the force majeure clause and the doctrine of supervening impossibility. Pl.'s Resp. to Mot. Partial Summ. J. 34-35 (doc. 39). To support this argument, SFI points to the federal administration's "broad trade war against China" as an event outside the knowledge or control of either party which was "unforeseen by SFI." Id. at 34.

The Service Contract's force majeure provision excused either parties' nonperformance for "acts of god, strikes, embargoes, or events similarly beyond the knowledge or control of either party" but not "commercial contingencies, for example, changing markets, poor management decisions and business declines, etc." Zhang Decl. Ex. 1, at 8 (doc. 29-1).

Consistent with the Service Contract, case law reinforces that, "unexpected difficulties and expense do not excuse performance of a contract unless so extreme that a practical impossibility exists and resulting in a hardship so extreme as to be outside any reasonable contemplation of the parties." Sachs v. Precision Prods. Co., 257 Or. 273, 281, 476 P.2d 199 (1970). "[M]ere market shifts or financial inability do not usually effect discharge." OWBR Ltd. Liab. Co. v. Clear Channel Commc'ns, Inc., 266 F.Supp.2d 1214, 1222 (D. Haw. 2003).

Page 17 – OPINION AND ORDER

In the context of fixed-price contracts, courts have been particularly hesitant to find that market changes resulting from governmental policies constitute a force majeure. See Langham-Hill Petroleum Inc. v. S. Fuels Co., 813 F.2d 1327, 1330 (4th Cir. 1987) ("[i]f fixed-price contracts can be avoided due to fluctuations in price, then the entire purpose of fixed-price contracts, which is to protect both the buyer and the seller from the risks of the market, is defeated"); N. Ind. Pub. Serv. Co. v. Carbon Cty. Coal Co., 799 F.2d 265 (7th Cir.1986) (rejecting a utility company's argument that a regulatory body's denial of a proposed rate increase makes the contract prohibitively expensive and a force majeure clause enforceable). Notably,

> [a] force majeure clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller (except insofar as escalator provisions give the seller some protection); if it falls, as here, the seller gains at the expense of the buyer. The whole purpose of a fixed price contract is to allocate risks in this way. A force majeure clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract.

Id. at 275; see also Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1293 (Fed. Cir. 2002) (observing that government fiscal or monetary policy decisions "have only an attenuated effect on the contracts at issue, at most making performance . . . unprofitable").

SFI acknowledges becoming aware of the impending tariffs when they initially took effect in 2017 – well before entering into the Service Contract in April 2018. Pl.'s Resp. to Mot. Partial Summ. J. 9-10 (doc. 39); Loe Decl. ¶ 6 (doc. 40). SFI also acknowledges "switching to other carriers in response to CSL's unfair tactics" during the term of the Service Contract. Pl.'s Resp. to Mot. Partial Summ. J. 36 (doc. 39). These facts undermine SFI's contention that the tariffs on wood products from China fit the definition of a force majeure and justify excusing its obligations under the MQP. This is especially true considering the parties expressly agreed that "commercial

contingencies," including "changing markets," would not impact their shared obligations under the Service Contract. Zhang Decl. Ex. 1, at 8 (doc. 29-1).

By agreeing to the terms of the force majeure provision, continuing to ship after the tariffs were first implemented, and demonstrating awareness in advance of entering the Service Contract that newly adopted trade policies could make its business less profitable, SFI forfeited its right to claim that the "trade war" excused its obligations under the MQP. Like the merchant in <u>Hong Kong Islands Line</u>, SFI had the ability to continue shipping, as evidenced by its decision to "switch to other carriers." <u>Hong Kong Islands Line Am. S.A. v. Distrib. Servs., Ltd.,</u> 795 F.Supp. 983, 989 (C.D. Cal. 1991). SFI was not prevented from shipping with CSL by unforeseen forces beyond their control, but merely chose to take its business elsewhere after the parties' business relationship broke down.

In its final purported excuse for nonperformance, SFI cites to the Oregon defense of "supervening impossibility of performance," otherwise known as "commercial frustration":

> the doctrine reads into [contracts], in the absence of repellent circumstances, an implied condition that the promisor shall be absolved from performance if, through a supervening circumstance for which neither party is responsible, a thing, event or condition which was essential so that performance would yield to the promisor the result which the parties intended him to receive, fails.

<u>Dorsey v. Or. Motor Stages,</u> 183 Or. 494, 503, 194 P.2d 967 (1948).

In <u>Dorsey</u>, the plaintiff operated buses in the Corvallis and Albany area with exclusive contractual rights to service Camp Adair. <u>Id.</u> at 498-99. The defendant, another common carrier, allegedly breached the parties' contract, but did so only under orders of the government requiring the use of the defendant's buses to meet the increased transportation demands in the area around the military training facility. <u>Id.</u> at 499.

SFI compares the requisitioning of buses by the government in <u>Dorsey</u> to the tariffs on imported plywood products from China in the present case. Pl.'s Resp. to Mot. Partial Summ. J. 35 (doc. 39). Yet unlike the circumstances in <u>Dorsey</u>, SFI was not compelled by the government to breach the terms of the Service Contract. Instead, the uncontravened evidence of record evinces SFI chose to discontinue shipping with CSL after CSL's purported bad acts.

A decision following <u>Dorsey</u> provides additional clarity surrounding when it is appropriate for a court to apply the defense of supervening impossibility. In <u>Smith</u>, the parties were aware that their ability to make use of leased coastal lands (and thus fulfill their obligations under their contract) was contingent upon permission to erect certain structures; the court declined to find that failure to obtain such permission constituted a supervening impossibility excusing nonperformance. Smith Tug & Barge Co. v. Columbia-Pac. Towing Corp., 250 Or. 612, 644, 443 P.2d 205 (1968). After acknowledging <u>Dorsey</u>, the <u>Smith</u> court explained:

> Not in all cases, however, is performance excused if the attainment of the purpose of the contract or lease is frustrated. It has been stated that supervening circumstances which frustrate the purpose of the contract do not excuse performance if the occurrence of such circumstances could have been reasonably anticipated by the parties and could have been provided for by an express provision in the contract . . . The courts have required a promisor seeking to excuse himself from performance of his obligations to prove that the risk of frustrating event was not reasonably foreseeable and that the value of counterperformance is totally or nearly totally destroyed, for frustration is no defense if it was foreseeable or controllable by the promisor, or if counterperformance remains valuable.

Id. at 641-44. (internal citations omitted).

The <u>Smith</u> court went on to find that the contingency which was being claimed as a supervening impossibility was "so obvious and material that the absence of any contractual provision concerning such contingency most probably indicates a willingness to assume the risk

of the nonoccurrence of the contingency and an adjustment of the consideration to reflect this assumption of risk." Id. at 643.

Given SFI's admitted awareness prior to entering the Service Contract that the tariffs would impact its ability to meet the MQP and its failure to categorize "commercial contingencies" as a qualifying force majeure event, this Court declines to find that the tariffs imposed a supervening impossibility rendering SFI's performance impracticable and thus excusable. In sum, the MQP is unambiguous and it is undisputed SFI materially breached that provision, with no viable excuse for its nonperformance.

## II.    SFI's Claims

CSL argues that COGSA applies to and preempts SFI's claims in light of the unequivocal terms of the underlying bills of lading, which were expressly incorporated by reference into the parties' telex releases. Def.'s Mot. Summ. J. 12-16 (doc. 46) By extension, CSL contends that, because plaintiff's claims accrued no later than June 14, 2018 (i.e., the date the last shipment was actually delivered), they are time-barred by COGSA's one-year statute of limitations. Id. at 16-28.

SFI does not meaningfully dispute the application of COGSA, except to the extent there is "no evidence SFI was aware of the limitation terms in the bill of lading, as applied to overland claims." Pl.'s Resp. to Mot. Summ. J. 21 (doc. 56). In addition, SFI asserts that "[t]he language of the contractual limitation should be interpreted against" CSL, in that the limitations period did not begin to run in regard to the Portland Shipment until the actual "date of delivery [since] delivery is possible"; and is inapplicable to the Chippewa Falls Shipment because "SFI's cargo was never delivered to [the proper] destination." Id. at 21-28. SFI attempts to cast its UPTA claim outside the grasp of COGSA's broad preclusive effect because it "doesn't involve a shipment or delivery," and instead is based on CSL's removal of credit terms, denouncement "of its resolution of disputed

matters," and holding SFI's "cargo hostage." Id. at 28-29. Alternatively, SFI argues that equitable estoppel and/or equitable tolling render its claims timely. Id. at 29-35.

A.    **Applicability of COGSA to SFI's Claims**

"COGSA applies to 'all contracts for carriage of goods by sea to or from ports of the United States in foreign trade.'" Dimond Rigging Co., LLC v. BDP Int'l, Inc., 914 F.3d 435, 442 (6th Cir. 2019) (quoting 46 U.S.C. § 30701 (Notes § 13)). Pursuant to COGSA, the "carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered." Underwood Cotton Co., Inc. v. Hyundai Merch. Marine (Am.), Inc., 288 F.3d 405, 408 (9th Cir. 2002) (quoting 46 U.S.C. app. § 1303(6)).

By its own terms, COGSA governs "from the time the ship's tackle is hooked onto the cargo at the port of loading until the time when cargo is released from the tackle at the port of discharge" – otherwise known as "tackle-to-tackle" – but it has become routine for parties to contractually extend COGSA's liability provisions "to cover the entire period in which the goods would be under a carrier's responsibility, including a period of inland transport." Pan Am. World Airways, Inc. v. Cal. Stevedore & Ballast Co., 559 F.2d 1173, 1177 n.5 (9th Cir. 1977); Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89, 96 (2010) (citations and internal quotations, brackets, and ellipses omitted). Where such a contractual extension takes place, the bill of lading and any associated documents "must be construed like any other contracts: by their terms and consistent with the intent of the parties." Norfolk, 543 U.S. at 16.

When COGSA governs, whether by force of law or contract, it completely preempts state law causes of action. See Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co., 215 F.3d 1217, 1220-21 (11th Cir. 2000) ("[w]e have found no cases in which a court has allowed a tort

claim to proceed when COGSA applies"). Stated differently, where the plaintiff's claim is made pursuant to a bill of lading, COGSA represents the plaintiff's exclusive remedy "whether that claim is for failure to issue a proper bill of lading, or for damage to the goods, or loss thereof, or asserted improper discharge thereof, or misdelivery, or whatever." Underwood, 288 F.3d at 410.

Given the aforementioned precedent, SFI does not contest COGSA's relevance to this lawsuit. In fact, SFI's sole argument is simply that it was not aware of the bill of ladings' extension of COGSA beyond "tackle-to-tackle." Pl.'s Resp. to Mot. Summ. J. 21 (doc. 56). In support of this proposition, SFI cites to the supplemental declaration of Andrea Macy, SFI's "employee [responsible] for managing the office in Portland," who states under penalty of perjury that "SFI was never actually provided the bill of lading incorporating COGSA terms for overland shipping." Suppl. Macy Decl. ¶¶ 1-2 (doc. 57). This statement is somewhat misleading given the content of the record. Specifically, as denoted above, the uncontravened documentary evidence demonstrates that the parties agreed to a "telex" release of both the Portland and Chippewa Falls Shipments in lieu of a traditional bill of lading. Zhang Decl. ¶¶ 8, 16 & Exs. 4, 9 (doc. 29-4); Second Henry Decl. ¶¶ 2-3 & Exs. 1-2 (doc. 47). Each telex release conspicuously stated:

> [SFI and Xuzhou Shelter] hereby agree to hold [CSL] and any of its agents, employees and independent contractors harmless from and indemnified against any and all risks, liabilities, costs and losses arising from the telex release of goods, and to assume obligations in accordance with terms of the bill of lading.

Zhang Decl. Exs. 4, 9 (doc. 29); Second Henry Decl. Exs. 1-2 (doc. 47). It is also undisputed SFI has shipped thousands of containers with CSL since 2015, and that CSL's terms and conditions are publicly available on CSL's website and through the FMC. Zhang Decl. ¶¶ 4, 6 (doc. 29); First Henry Decl. ¶¶ 6-7 & Exs. D-E (doc. 30); see also Ins. Co. of N. Am. v. Puerto Rico Marine

Mgmt., Inc., 768 F.2d 470, 477-79 (1st Cir. 1985) (shippers are bound "by all the incorporated terms and conditions contained within a long-form bill of lading filed with the FMC").

In light of these facts, COGSA controls SFI's claims, irrespective of whether Ms. Macy was personally aware of the CSL's standard terms and conditions.[6] Sea-Land Serv. Inc. v. Lozen Int'l LLC, 285 F.3d 808, 814-17 (9th Cir. 2002); see also Diamond v. State Farm Mut. Auto. Ins. Co., 2010 WL 2904640, *5 (E.D. Cal. July 26), adopted by 2010 WL 3371213 (E.D. Cal. Aug. 26, 2010) ("[d]espite plaintiff's protestations that his is not a maritime action and he is not seeking relief under COGSA, COGSA was contractually made applicable to all claims made against [the carrier] in connection with the goods so long as they remained in [the carrier]'s control [such that] COGSA completely preempts any state law remedy"). This is especially appropriate considering that all of SFI's claims concern the underlying bills of ladings. See All Pac. Trading v. Vessel M/V Hanjin Yosu, 7 F.3d 1427, 1432 (9th Cir. 1993) (initiation of suit constitutes acceptance of the terms of a bill of lading); see also MCA TV, Ltd. v. Pub. Interest Corp., 171 F.3d 1265, 1275 (11th Cir. 1999) (the injured party "can either ratify the contract and sue for damages, or it can rescind the contract and repudiate it [but not] both").

---

[6] To the extent SFI intimates that its UPTA claim is factually distinct, its argument is unpersuasive. Critically, SFI's complaint makes clear that its UPTA claim emanates from the Portland and Chippewa Falls Shipments – namely, CSL's pursuit of demurrage and container damage fees in association with the Portland Shipment, and transport costs associated with the Chippewa Falls Shipment. First Am. Compl. ¶ 27 (doc. 8). That SFI proceeded to engage in self-help in March 2019 by deducting amounts purportedly owed to it from other shipment payments, which, in turn, led CSL to revoke SFI's credit terms in accordance with the Service Contract and demand immediate payment, does not transform SFI's UPTA claim into one that falls outside of the bills of lading. Id. ¶ 28; Zhang Decl. ¶ 19 & Ex. 12 (doc. 29-12). This is especially true considering that, as discussed above, the parties' contracts permitted CSL's actions and broadly limited CSL's liability. See generally Zhang Decl. Exs. 1-2 (doc. 29).

**B.**    **"Delivery" Dates of the Portland and Chippewa Falls Shipments**

As noted above, the date of "delivery" determines when a claim begins accruing under COGSA's one-year statute of limitations. "Delivery" in this context can occur actually or constructively; the former takes place "upon notification of the consignee that the goods arrived and after a reasonable opportunity for the consignee to obtain or inspect the goods." Starrag v. Maersk, Inc., 486 F.3d 607, 617 (9th Cir. 2007).

**i.**    **Portland Shipment**

In regard to the Portland Shipment, SFI argues that its claims did not begin to accrue until January 8, 2020, when it was able to pick up its cargo without paying demurrage costs. Pl.'s Resp. to Mot. Summ. J. 23-25 (doc. 56). Essentially, SFI maintains that, because the charges assessed by CSL were not "valid," CSL did not "'deliver' the cargo, actually or constructively," until actual possession took place. Id. In support of this proposition, SFI cites to two cases – Pa. R. Co. v. Moore-McCormack Lines, Inc., 370 F.2d 430 (2d Cir. 1966), and Fireman's Fund Ins. Cos. v. Big Blue Fisheries, 143 F.3d 1172 (9th Cir. 1998) – neither of which involved COGSA or the accrual of claims based on delivery. Id.

The Court declines to adopt SFI's proffered interpretation. Doing so would create a rule necessitating actual physical transfer of the cargo prior to the commencement of the accrual period, but such a rule is both contrary to the plain language of the parties' contracts and the weight of relevant authority. Zhang Decl. Ex. 2, at 35-45 (doc. 29-2); see also Nat'l Packaging Corp. v. Nippon Yusen Kaisha, 354 F.Supp. 986, 987 (N.D. Cal. 1972) (court interpreting "COGSA as rejecting the actual transfer definition" and instead "adopt[ing] the discharge + notice + opportunity to receive formula of 'proper delivery'"); Underwood, 288 F.3d at 408 (COGSA

"appears to key on the date when the harm in question was inflicted (the delivery of damaged goods or the failure to deliver goods)").

In other words, constructive delivery does not require that the plaintiff actually inspect or obtain the goods, even where a dispute exists over demurrage and other charges. See Newmann v. Mediterranean Shipping Co., 2019 WL 4805864, *2-3 (S.D. N.Y. Sept. 30, 2019) ("constructive delivery occurred when the containers were ready for delivery," even though the parties never resolved their dispute about charges and the carrier sold the cargo at auction); see also Diamond v. State Farm Mut. Auto. Ins. Co., 2011 WL 1807331, *4-7 (E.D. Cal., May 11), adopted by 2011 WL 2946363 (E.D. Cal. July 21, 2011) (action time-barred under COGSA's statute of limitations where the plaintiff brought suit more than one year from the date on which he first learned of the cargo's delivery, even though he was ultimately unsuccessful in retrieving that cargo); Shoaga v. Maersk, Inc., 2008 WL 4615445, *3 (N.D. Cal. Oct. 17, 2008) (because the plaintiff "was aware that the cargo container at issue would not be released unless he paid demurrage charges in January 2005 [his claims] accrued on that date").

Here, because SFI received notice of the Portland Shipment's availability for pick up on May 23, 2018, SFI's inability or refusal to access that cargo does not toll COGSA's time-for-suit provision.[7] Zhang Decl. ¶ 13 & Ex. 7 (doc. 29-7); see also First Am. Compl. ¶ 8 (doc. 8); Suppl. Macy Decl. Ex. B, at 1 (doc. 57) (SFI seeking pre-judgment interest in relation to the Portland

---

[7] Although the validity of the charges leveraged by CSL is not material to the timeliness of SFI's claims, the Court notes that the parties' contract authorized CSL to seek compensation for the damage done to its container, as well as to begin charging demurrage at the time SFI refused to pay the disputed fees. See, e.g., Zhang Decl. Exs. 2, 6 (doc. 29). In any event, SFI had other remedies in lieu of incurring demurrage while disputing fault related to the Portland Shipment. Also, by force of law, a "lien exists in favor of a shipowner on cargo for charges incurred during the course of its carriage," which would have been lost had CSL unconditionally released the Portland Shipment. Arochem Corp. v. Wilomi, Inc., 962 F.2d 496, 499-500 (5th Cir. 1992).

Page 26 – OPINION AND ORDER

Shipment beginning on May 2, 2018, the date the container was damaged); Suppl. Macy Decl. Ex. B, at 2 (doc. 57) (SFI email to CSL, sent on May 30, 2018, referring to "damage done to the container and the contents while the container was in transit" and indicating that "we have been in contact with our attorney regarding this occurrence"). Significantly, by June 1, 2018, SFI explicitly recognized CSL's "delivery": on that date Ms. Macy wrote an email to CSL expressing that "today is the last free day [before] demurrage is assessed" and requesting that, if CSL was unwilling to cover these storage costs, "this container [be] released . . . ASAP so we may pick up." Macy Decl. ¶ 8 (doc. 44).

In sum, CSL delivered the Portland Shipment on May 23, 2018, which SFI acknowledged no later than June 1, 2018, and SFI filed this lawsuit on July 10, 2019.

### ii.    Chippewa Falls Shipment

SFI's arguments concerning the Chippewa Falls Shipment are even more tenuous: SFI neither disputes that it completed picking up the cargo by June 14, 2018, in St. Paul, nor that the cargo was in its client's possession in Chippewa Falls by June 29, 2018. Pl.'s Resp. to Mot. Summ. J. 25-28 (doc. 56). Additionally, SFI does not proffer an alternate date from which to calculate accrual. Id. Rather, SFI intimates that CSL's failure to deliver the Chippewa Falls Shipment to the proper location qualifies as an "unusual circumstance . . . fraught with coercion and bullying tactics," presumably such that the limitations period is inapplicable. Id. at 27.

In light of the dearth of evidence concerning an alternate date of delivery or any blatantly illegal/wrongful conduct on behalf of CSL given the unambiguous terms of the parties' contracts, the Court finds that no disputed issue of material fact exists concerning whether plaintiff's claims related to the Chippewa Falls Shipment are time-barred. See, e.g., Loe Decl. ¶¶ 6-17 (doc. 40); Bennett Decl. ¶¶ 2-13 (doc. 41); Macy Decl. ¶¶ 4-37 (doc. 44); see also Celotex, 477 U.S. at 322

Page 27 – OPINION AND ORDER

(summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden on proof at trial"); Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment").

Indeed, as delineated in Section I(B)(i), misdelivery does not constitute an unreasonable deviation, especially because there is no evidence that CSL intentionally caused damage to or delayed SFI's cargo; by extension, misdelivery does not extend the statute of limitations. In any event, even "an unreasonable course deviation does not nullify COGSA's one year statute of limitations." Mesocap Indus. v. Torm Lines, 194 F.3d 1342, 1343-45 (11th Cir. 1999).

Therefore, SFI's claims related to the Chippewa Falls Shipment accrued no later than June 14, 2018, the date of actual delivery (or misdelivery), more than one year before this lawsuit was initiated. See W. Gear Corp. v. State Marine Lines, Inc., 362 F.2d 328, 331 (9th Cir. 1966) ("[w]henever there is an actual delivery of the goods . . . the time to sue runs from the date of delivery rather than from the date when the goods should have been delivered"); see also Clevo Co. v. Hecny Shipping Ltd., 715 F.3d 1189, 1193-95 (9th Cir. 2013) (claims time-barred under COGSA where the action was filed "more than one year after the misdelivery occurred").

## C.    Equitable Estoppel or Equitable Tolling

Lastly, SFI contends CSL should be estopped from invoking COGSA's statute of limitations because CSL "had no right to impose charges [in relation to the Portland Shipment] for damage SFI did not cause" and SFI had invested heavily in their business relationship – it "had 25 containers already underway, and could not afford to risk another 'hold up' or demand while those shipments were in [CSL's] control" – such that "SFI couldn't risk doing anything until it had

completed all shipments, and picked up its cargo from [CSL] before filing this suit." Pl.'s Resp to Mot. Summ. J. 32-34 (doc. 56). SFI also contends that the limitation periods should be tolled because "SFI pursued its rights diligently" and CSL engaged in "illegitimate and inequitable conduct." Id. at 34-35.

"Equitable estoppel focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit, whereas equitable tolling focuses on the plaintiff's excusable ignorance of the limitations period and on lack of prejudice to the defendant." Santa Maria v. Pac. Bell, 202 F.3d 1170, 1176 (9th Cir. 2000), overruled on other grounds by Socop-Gonzalez v. Immigration & Naturalization Serv., 272 F.3d 1176 (9th Cir. 2001) (en banc); see also Petroleos Mexicanos Refinacion v. M/T King A, 554 F.3d 99, 110 (3d Cir. 2009) ("equitable tolling is proper only when the principles of equity would make the rigid application of a limitation period unfair," such as "where a defendant actively misleads a plaintiff with respect to her cause of action" or "where the plaintiff has been prevented from asserting her claim as a result of other extraordinary circumstances") (citations and internal quotations and brackets omitted).

Initially, CSL had a legal right to withhold part of the Portland Shipment and impose charges. SFI's sole evidence relating to the cause of the accident is Ms. Macy's statement that she was told by a CSL employee that CSL's driver "was likely tired when he rounded the corner too fast." Macy Decl. ¶ 4 (doc. 44). Yet it is undisputed that, on May 14, 2018, an independent marine surveyor concluded that the container tipped due to SFI's agent's insufficient blocking and bracing of the cargo. Zhang Decl. ¶ 11 & Ex. 6 (doc. 29-6). Further, SFI admits that the cargo "suffered only minor damage." Pl.'s Resp. to Mot. Partial Summ. J. 13 (doc. 39); see also First Henry Decl. Ex. B, at 17-28 (doc. 30-2) (surveyor's report, dated January 8, 2020, revealing "minor damage" in regard to approximately 20 out of 3,240 sheets of plywood and "[n]o signs of moisture damage

Page 29 – OPINION AND ORDER

or signs of moisture"). Thus, the record reflects that CSL had a good faith reason to withhold the cargo, which objectively undermines SFI's broad assertions of wrongdoing.

Moreover, concerning equitable estoppel, there is simply no evidence that CSL took any action to stop SFI from timely filing suit. As specified in Section II(B)(i), SFI had the knowledge and means to sue CSL over the Portland Shipment as early as May 30, 2018, when SFI informed CSL that it was seeking damages and had already been in touch with its attorney. See Strickland v. Evergreen Marine Corp. (Taiwan), 2007 WL 539424, *7 (D. Or. Feb. 15, 2007) (inexperienced shippers' claims were time-barred and not entitled to equitable tolling; even though the contract was "arguably illegible," the plaintiffs retained counsel prior to filing suit and were on constructive notice of the bill of lading's terms, and there was otherwise "no evidence that [the defendant] tried to conceal the limitation provision from plaintiffs, or that [the defendant] lulled plaintiffs into a false sense of complacency regarding the time limit for bringing an action against it").

SFI's estoppel argument is also unpersuasive to the extent it is based on CSL's agent's statement that he "would work something out" concerning the Portland Shipment's disputed charges, and SFI's fear of "retaliation" after sending "notice that it was exercising its offset rights on March 11, 2019." Pl.'s Resp to Mot. Summ. J. 33 (doc. 56). As addressed in Section I(B)(iii), SFI has not pointed to any basis in law for its purported "offset rights" and CSL acted pursuant to the Service Contract by revoking SFI's credit terms. SFI's allegations about what CSL's agent said are hearsay but, even if true, these statements cannot be construed as a promise by CSL not to invoke COGSA's time bar. At most, the statements were geared towards resolving the parties' dispute. See Birdsall, Inc. v. Tramore Trading Co., 771 F.Supp. 1193, 1198 (S.D. Fla. 1991) (rejecting an estoppel argument in a COGSA time-bar case, explaining "if mere settlement negotiations tolled the time for filing, the statute of limitations would be of little value").

Page 30 – OPINION AND ORDER

Finally, there is no evidence that any scenario giving rise to equitable tolling is present here. Plaintiff broadly invokes CSL's "own illegitimate and inequitable conduct" as the basis of its tolling argument. Pl.'s Resp to Mot. Summ. J. 34 (doc. 56). However, as discussed herein, the evidence of record merely reflects that, when business conflicts arose, both parties engaged in (arguably divisive) conduct in an effort to forestall losses. That SFI perhaps sustained greater damage to its business as a result does not qualify as an extraordinary circumstance giving rise to equitable tolling. Cf. Dimond Rigging, 914 F.3d at 446-48 (the plaintiff's arguments concerning the defendants' misrepresentations and violation of "various federal shipping laws and regulations" were insufficient to establish an equitable defense in regard to COGSA's one-year state of limitations). Regardless, the record clearly reflects that SFI was well-aware of its claims within the limitations period. Therefore, SFI's claims are time-barred and summary judgment is proper.

## CONCLUSION

For the reasons stated herein, CSL's Motion for Partial Summary Judgment (doc. 28) and Motion for Summary Judgment (doc. 46) are granted. SFI's requests for oral argument are denied as unnecessary.

IT IS SO ORDERED.

DATED this 28th day of July, 2020.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge