IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| SHELTER FOREST INTERNATIONAL ACQUISITION, INC., an Oregon Corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>COSCO SHIPPING (USA) INC., a Delaware Corporation; COSCO SHIPPING LINES (NORTH AMERICA) INC., a Delaware Corporation; COSCO SHIPPING TERMINALS (USA) LLC, a Delaware LLC; RUDY ROGERS, an individual; COSCO SHIPPING LINES CO., LTD.; and JANE AND JOHN DOES NOS. 1-3,<br><br>        Defendants. | Case No. 3:19-cv-01259-JR<br><br>OPINION AND ORDER |

RUSSO, Magistrate Judge:

Shelter Forest International Acquisition, Inc. ("SFI") filed this action against defendants COSCO Shipping (USA) Inc., COSCO Shipping Lines (North America) Inc., COSCO Shipping Terminals (USA) LLC, Rudy Rogers, and COSCO Shipping Lines Co., Ltd. ("CSL") alleging multiple contractually-based claims under state law.[1] All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). CSL now moves for summary judgement on its remaining counterclaim pursuant to Fed. R. Civ. P. 56. For the reasons stated below, CSL's motion is granted in part and denied in part.

---

[1] All parties except CSL were subsequently voluntarily dismissed.

Page 1 – OPINION AND ORDER

## BACKGROUND

CSL is a shipping company based in China operating a fleet of oceangoing containerships that transport cargo internationally, including between China and the United States. SFI is an Oregon corporation that imports and distributes lumber, plywood, and other building materials.

Disputes over two separate shipments – i.e., Portland Shipment and the Chippewa Falls Shipment – gave rise to the present action. Each of these shipments was booked under the parties' April 2018 Service Contract, as well as an individual bill of lading, which incorporated CSL's standard terms and conditions and set out the particulars for the respective shipments.[2] These terms and conditions appear on the backside of every one of CSL's bills of lading and are also published as part of CSL's tariff of general applicability, which is filed with the Federal Maritime Commission ("FMC"). Accordingly, CSL's standard terms and conditions are publicly available through the FMC and CSL's website.[3] Second Wei Zhang Decl. ¶ 3 (doc. 70).

---

[2] A service contract is a written agreement between one or more shippers and ocean common carriers, or an agreement between or among ocean common carriers, in which: the shipper commits to providing a certain volume or portion of cargo over a fixed time period, and the carrier or agreement commits to a certain rate or rate schedule and a defined service level (such as assured space, transit time, port rotation, or similar service features). 46 U.S.C. § 40102(21). A service contract must be filed with the Federal Maritime Commission and include certain terms. 46 U.S.C. § 40502(b), (d). A bill of lading, in contrast, is a written contract that "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18-19 (2004).

[3] SFI previously disputed, and currently "does not concede," that it had sufficient knowledge of these terms and conditions to make them enforceable; however, for the purposes of these proceedings, SFI "stipulates that those terms apply." Pl.'s Resp. to Mot. Summ. J. 15 n.42 (doc. 77); see also Ins. Co. of N. Am. v. Puerto Rico Marine Mgmt., Inc., 768 F.2d 470, 477-79 (1st Cir. 1985) (shippers are bound "by all the incorporated terms and conditions contained within a long-form bill of lading filed with the FMC"); Sea-Land Serv. Inc. v. Lozen Int'l LLC, 285 F.3d 808, 814-15 (9th Cir. 2002) (traditional bill of lading's terms apply to telex releases).

Page 2 – OPINION AND ORDER

The first incident, the Portland Shipment, was booked in April 2018 by SFI's affiliate, Xuzhou Shelter, who also was responsible for packing the containers. Wei Zhang Decl. ¶¶ 7, 9 (doc. 29). An SFI representative was present at Xuzhou Shelter's facility to ensure that its plywood was loaded in accordance with SFI's customary practices and consistent with industry standards. Fangmu Zhang Decl. ¶¶ 4-7 & Ex. A (doc. 78); Loe Decl. ¶¶ 5-8 (doc. 82).

The bill of lading for the Portland Shipment identified Xuzhou Shelter as the shipper and SFI as the consignee. Wei Zhang Decl. Ex. 3, at 2 (doc. 29-3). Xuzhou Shelter requested, and CSL agreed, to "telex release" the bill of lading to SFI's associate in China. Wei Zhang Decl. ¶ 8 & Ex. 4 (doc. 29-4); Second Henry Decl. ¶ 2 & Ex. 1 (doc. 47). Under the bill of lading, CSL is "not to be liable for loss of or damage to the Goods" where it does not pack the containers and SFI "shall indemnify [CSL] against any loss, damage, liability or expense incurred by [CSL] if such loss, damage, liability or expense has been caused by . . . the manner in which the Container has been filled, packed, loaded or stuffed." Wei Zhang Decl. Ex. 2, at 37 (doc. 29-2).

A dispute arose when one of SFI's cargo shipments, and CSL's containers, was damaged in a rollover accident. Wei Zhang Decl. ¶¶ 10-12 (doc. 29). The parties disagree as to the cause of the accident – i.e., CSL's negligent driving or SFI's failure to properly load the container. Compare Fangmu Zhang Decl. ¶¶ 10-11 (doc. 78); Scheibe Decl. ¶¶ 6-19 (doc. 81); Loe Decl. ¶¶ 5-8 (doc. 82); Suppl. Scheibe Decl. Ex. A (doc. 83); with Wei Zhang Decl. ¶ 11 & Ex. 6 (doc. 29-6); Buhler Decl. Ex. A (doc. 80-1). The cargo was ultimately delivered to Portland on May 23, 2018, after being transloaded into a different container, and made available to SFI for pick-up upon payment for container damage and cargo transloading charges, which totaled $6,360.61. Wei Zhang Decl. ¶¶ 12-13 & Exs. 6-7 (doc. 29); Buhler Decl. Ex. C (doc. 80-3); Buhler Decl. Ex. E, at 2 (doc. 80-5). The parties were unable to resolve fault for the damage to SFI's cargo and CSL's container,

Page 3 – OPINION AND ORDER

such that CSL continued to hold the cargo in the container yard and on June 2, 2018, began charging demurrage.[4] Buhler Decl. Ex. F (doc. 80-6).

On March 15, 2019, "SFI wired the $6,369.61" in container damage and cargo transloading charges to CSL "under protest," in conjunction with outstanding freight charges on other shipments and arranged with CSL to take possession of the Portland Shipment "without concurrent payment of the demurrage" and have its credit terms restored. Loe Decl. ¶ 10 (doc. 82). CSL ultimately refused to release the Portland Shipment or reinstate SFI's credit terms. Id.

SFI subsequently discontinued shipping with CSL. SFI received its last shipment from CSL on July 9, 2019.

On July 10, 2019, SFI initiated this action in Multnomah County Circuit Court. In August 2019, CSL removed SFI's complaint to this Court on the basis of diversity jurisdiction. Later that month, SFI filed its First Amended Complaint alleging common law claims for negligence, conversion, breach of contract, and misrepresentation, as well as a statutory claim under Oregon's Unfair Trade Practices Act and seeking damages in excess of one million dollars. In October 2019, CSL asserted two counterclaims for breach of contract, one relating to the Service Contract's

---

[4] Demurrage is a charge carriers impose upon shippers or receivers for the detention of freight cars or containers beyond a certain allotted free time period for loading and unloading cargo. See, e.g., New Orleans & Lower Coast R. Co. v. Int'l Proteins Corp., 514 F.Supp. 46, 52 (E.D. La. 1981); SinoTrans Container Lines Co. v. N. China Cargo Svs., 2009 WL 10700621, *6-7 (N.D. Cal. Feb. 3, 2009). In essence, the term corresponds to "the carrier's damages arising from the shipper's failure to take delivery of goods within the time provided by the contract." SinoTrans Container Lines Co., 2009 WL 10700621 at *6. As such, CSL's tariff instructs that "Demurrage Charges are those costs which are incurred when a container with cargo, or cargo devanned from a container, is held at a carrier's discharge port or destination point[,] or at a carrier's Destination Interchange Terminal (DIT), beyond the permitted free demurrage time as stipulated in the applicable rule in this tariff." Zhang Decl. Ex. A, at 8 (doc. 70-1).

Page 4 – OPINION AND ORDER

minimum quantity provision and the other relating to Xuzhou Shelter's purported negligent packing of the Portland Shipment.

On January 8, 2020, by agreement of the parties and reserving all rights and defenses, SFI took possession of the Portland Shipment without paying demurrage.

On April 2 and May 4, 2020, CSL moved for summary judgment as to its first counterclaim and SFI's claims, respectively. Concerning the former, CSL argued that SFI breached the Service Contract's unambiguous minimum quantity provision. Regarding the latter, CSL asserted that SFI's claims were time-barred under the Carriage of Goods by Sea Act's ("COGSA") one-year statute of limitations. On July 28, 2020, the Court issued an Opinion and Order granting CSL's motions.[5] See generally Shelter Forest Int'l Acquisition, Inc. v. COSCO Shipping (USA) Inc., -- F.Supp.3d --, 2020 WL 4340979 (D. Or. July 28, 2020).

On October 15, 2020, CSL filed the present motion as to its sole remaining counterclaim. In particular, CSL seeks $160,930 in demurrage charges from June 2, 2019, through January 8, 2020, as well as attorney fees and costs. Briefing on that motion was completed on December 30, 2020.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[5] As discussed previously, CSL's bill of lading calls for the application of COGSA to shipments to and from the United States; however, it is otherwise governed by Chinese law. Wei Zhang Decl. Ex. 2, at 44-45 (doc. 29-2). The application of Chinese law does not change the Court's analysis or result in a different outcome. See, e.g., SinoTrans Container Lines Co., 2009 WL 10700621 at *4-6.

Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

CSL argues that summary judgment on its remaining claim is proper because the undisputed evidence of record demonstrates "SFI breached the bill of lading by refusing to take timely possession of the Portland Shipment and refusing to pay demurrage." Def.'s Mot. Summ. J. 13-16 (doc. 69). Further, CSL maintains that fault for the rollover accident and, by extension, the damage to CSL's container and SFI's cargo is irrelevant: "Neither the bill of lading nor maritime law allow SFI to withhold amounts due under the bill of lading as a set-off for its time barred claims for damage under COGSA." Id. at 17.

In contrast, SFI contends that CSL's motion is "premature" because a "carrier can only recover these costs if the dispute that gave rise to the possessory lien is ultimately determined in the carrier's favor." Pl.'s Resp. to Mot. Summ. J. 1-2 (doc. 77). Specifically, SFI asserts that,

Page 6 – OPINION AND ORDER

"[p]ursuant to both the terms of the controlling bill of lading and the general maritime law, CSL has the burden of proving that the damage to the container, and the costs flowing therefrom which give rise to CSL's possessory lien, were caused by SFI's improper loading of the container" before being entitled to demurrage. Id. at 2.

Alternatively, SFI argues CSL failed to mitigate its damages since "CSL's claim for container damage amounted to $6,360" and the Portland Shipment "had an invoice value of $21,000 and had suffered de minimis damage." Id. at 2-3. Stated differently, SFI maintains it was unreasonable for CSL "to protect its $6,360 claim by incurring additional costs more than 25 times greater than its initial claim." Id. According to SFI, the Portland Shipment could have been "sold at a discount at a salvage sale through a salvage broker, a common practice in the shipping industry, [to] easily [cover] its container damage claim." Id. at 18; Wanliss Decl. ¶¶ 7-16 (doc. 79); Loe Decl. ¶ 12 (doc. 82).

**I.      Breach of Contract**

Federal courts apply federal common law when interpreting maritime contracts such as a bill of lading or service contract. Norfolk, 543 U.S. at 21-24; see also F.W.F., Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342, 1356 (S.D. Fla. 2007) (applying "general federal maritime law" to interpret a maritime contract because the parties did not articulate any specific state interest at stake). As such, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." Norfolk, 543 U.S. at 31. To establish a claim for breach of contract under federal maritime law, the plaintiff must prove "(1) the terms of a maritime contract, (2) that the contract was breached, and (3) the reasonable value of the purported damages." Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1249 (11th Cir. 2005) (citing Exxon Corp. v. Cent. Gulf Lines, Inc., 500 U.S. 603, 605-06 (1991)).

Page 7 – OPINION AND ORDER

SFI posits "[i]t is well established that a carrier is not entitled to recover damages or charges, including demurrage, incurred as the result of the fault of the carrier or its agent," and cites to five out-of-circuit cases in support of this proposition – United States v. Sugarland Indus., 281 Fed. 239 (S.D. Tex. 1922), aff'd, 296 F. 913 (5th Cir. 1924); Pa. R. Co. v. Moore-McCormack Lines, Inc., 370 F.2d 430 (2d Cir. 1966); Port Terminal R.R. Ass'n v. Connell Rice & Sugar Co., 387 F.2d 355 (5th Cir. 1967); Shipping Corp. of India Ltd. v. Sun Oil Co., 569 F.Supp. 1248 (E.D. Penn. 1983); and Finora Co., Inc. v. Amitie Shipping, Ltd., 54 F.3d 209 (4th Cir. 1995). Pl.'s Resp. to Mot. Summ. J. 14 (doc. 77). Essentially, SFI maintains that CSL is not entitled to demurrage until it proves, as a matter of law, that it was not responsible for the damage to the container and cargo.

Initially, none of the cases relied on by SFI involve even remotely analogous circumstances nor required a determination of carrier non-fault as a general rule. At most, this precedent suggests that, where the carrier causes a delay (usually related to the unloading or delivery of cargo), it cannot recoup demurrage for that period of delay. Nonetheless, these cases generally reaffirm the "general rule" that "absence of fault in the shipper or consignee [is] not sufficient to excuse it from liability for demurrage"; rather, demurrage is incurred "where there has been an excess of lay days over those stipulated[,] regardless of what brought about the delay" (subject to certain exceptions not applicable here). Pa. R. Co., 370 F.2d at 432 (citation and internal quotations omitted); see also New Orleans & Lower Coast R. Co., 514 F.Supp. at 53 ("[s]hippers are strictly liable for demurrage charges; liability attaches even if they have not caused the delay themselves"); Union Pac. R. Co. v. United States, 490 F.2d 1385, 1389-91 (Ct. Cl. 1974) (rejecting the defendant's argument that a determination of "fault is necessary for demurrage assessment").

In other words, these cases do not plainly support SFI's position, especially considering the particular facts of this case. Namely, the evidence of record establishes SFI had notice of delivery and access to the Portland Shipment as of May 23, 2018, subject to the payment of relatively nominal container damage and cargo transloading charges (charges which could subsequently be challenged via separate legal avenues and which SFI eventually paid).[6] SFI contemporaneously recognized that, although the parties continued to dispute the cause of the rollover accident, June 1, 2018, was the last free day of storage before demurrage began to accrue. Macy Decl. ¶ 8 (doc. 44). That SFI chose not to take possession of the Portland Shipment, or immediately pay the container damage and cargo transloading fees, is not suggestive of any delay on CSL's behalf or vis major.

Moreover, under the express terms of the underlying bill of lading, CSL was entitled to charge demurrage for storing SFI's unclaimed cargo beginning on June 2, 2018, after SFI's ten days of free time following delivery lapsed. The relevant portions of the parties' written agreements are as follows: the Service Contract states that, unless otherwise specified, "transportation provided pursuant to this contract is subject to all applicable rules, regulations, rates and charges set forth in the carrier's tariff(s) of general applicability including amendments and reissues thereto." Wei Zhang Decl. Ex. 1, at 17 (doc. 29-1). CSL's standard bill of lading likewise states: "Demurrage and [d]etention shall be charged according to the tariff published on

---

[6] As SFI acknowledges, CSL had a maritime lien over the Portland Shipment to preserve its right to payment of the transloading and container damage charges. Pl.'s Resp. to Mot. Summ. J. 12-13 (doc. 77). And, as CSL observes, SFI had other remedies where those charges are disputed – "[i]t could have timely paid freight and charges for the damaged container, during the allowed free time, then filed a timely suit against CSL for damages" or "posted a bond in order to obtain timely release of its goods, and then filed a timely suit for its own damages," etc. Def.'s Mot. Summ. J. 18 (doc. 69).

Page 9 – OPINION AND ORDER

the Home page of LINES.COSCOSHIPPING.COM." Wei Zhang Decl. Ex. 2, at 34 (doc. 29-2);

Wei Decl. Ex. 3 (doc. 29-3).

Section 10 of CSL's bill of lading, entitled "MERCHANT-STUFFED CONTAINER," asserts that:

> If a Container has not been stuffed by or on behalf of the Carrier, the Carrier shall not be liable for loss of or damage to the Goods and the Merchant shall indemnify the Carrier against any loss, damage, liability or expense incurred by the Carrier if such loss, damage, liability or expense has been caused by . . . the manner in which the Container has been filled, packed, loaded or stuffed.

Wei Zhang Decl. Ex. 2, at 37 (doc. 29-2). Moreover, Section 22, entitled "NOTIFICATION AND DELIVERY," declares:

> The Merchant shall take delivery of the Goods within the time provided for in the Carrier's applicable Tariff or as required by the Carrier . . . Refusal by the Merchant to take delivery of the Goods in accordance with the terms of this Clause, notwithstanding its having been notified of the availability of the Goods for delivery, shall constitute an irrevocable waiver by the Merchant to the Carrier of all and any claims whatsoever relating to the Goods or the Carriage. The Merchant shall be liable for any losses, damages, expenses and liabilities incurred and sustained by the Carrier arising from such refusal.

Id. at 43.

Under Section 9, SFI is responsible for demurrage if it uses CSL's container past the free "time prescribed in the Tariff." Id. Section 13 similarly emphasizes that "[a]ll Freight and charges shall be paid without any set-off, counter-claim, deduction, or stay of execution before delivery of the Goods." Id. at 39. Finally, Section 16 of CSL's bill of lading divulges that "[t]he Carrier shall have a lien on the Goods and any documents relating thereto for Freight, dead Freight, demurrage, detention, and for any expenses incurred by the Carrier for recoopering, repacking, remarking,

fumigation or required disposal of faulty Goods [and] for the Carrier's lawful charges arising out of transportation of other Goods on behalf of the Merchant." Id. at 40.[7]

Thus, any dispute concerning which party was ultimately responsible for the damage to CSL's container or SFI's cargo is immaterial because both the parties' underlying agreements and federal maritime law make clear that SFI must accept delivery of its goods and pay all costs without offset (and regardless of whether SFI has its own claim for damages). See King Ocean Cent. Am., S.A. v. Angel Food & Fruit Co., 1995 WL 819141, *3 (S.D. Fla. Oct. 12, 1995) ("[i]t is a well-established and ancient rule that once the goods have been carried to their destination and are ready for delivery, the freight must be paid even though the goods are damaged . . . [this] is an independent obligation and is not discharged because of failure to deliver the cargo in good condition") (collecting cases); see also Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280, 281-82 (2d Cir. 1986) (clause calling for freight "to be payable without discount on delivery . . . clearly expressed [the parties'] intent [that the shipper] would not be able to evade the prompt performance of this contractual obligation by asserting a claim in abatement or set-off"); Maersk Inc. v. Am. Midwest Commodities Exp. Co., Inc., 1998 WL 473945, *3-4, 6 (S.D. N.Y. Aug. 10, 1998) (shipper's counterclaim for untimely delivery of cargo, which was time-barred

---

[7] For the first time in its reply brief, CSL cites to Section 15 of the bill of lading, which governs "CARRIAGE AFFECTED BY CONDITION OF THE GOODS" and states, in relevant part: "If it appears at any time that the Goods cannot safely or properly be carried or carried further, either at all or without incurring any additional expenses or taking any measure(s) in relation to the Goods or the Container, the Carrier may [exercise its discretion to take appropriate measures and the] Merchant shall indemnify the Carrier against any additional expense so incurred." CSL's Reply to Mot. Summ. J. 8-11 (doc. 84) (quoting Wei Zhang Decl. Ex. 2, at 39-40 (doc. 29-2)). The Court granted SFI's request for leave to file a surreply to address this argument. See generally SFI's Surreply to Mot. Summ. (doc. 87). As addressed herein, the Court does not find Section 15 dispositive (although it does provide further support regarding the existence of a lien irrespective of fault under the undisputed facts).

Page 11 – OPINION AND ORDER

under COGSA, was not grounds to withhold or offset payment due to a carrier under the bill of lading, explaining "[t]he carrier's obligation to deliver the goods is legally distinct from any claim by the shipper that the goods were damaged").

Further, as this Court previously denoted that, irrespective of actual fault, the May 14, 2018, marine surveyor report – which concluded that the container tipped due to SFI's agent's insufficient blocking and bracing of the cargo – established, at a minimum, "a good faith reason [for CSL] to withhold the cargo." Shelter Forest Int'l Acquisition, 2020 WL 4340979 at *16. SFI was contemporaneously aware of this report and of CSL's position that demurrage would begin accruing on June 2, 2018, if the container damage and cargo transloading costs were not paid, and the cargo removed from its storage facility.

Significantly, SFI never indicated to CSL that it was abandoning the Portland Shipment, nor do the terms of the parties' agreements require SFI to dispose of leftover cargo in a particular manner (although it does grant CSL "discretion" to dispose of cargo in essentially any manner it deems fit if a maritime lien arises or SFI "fails to take delivery of the Goods"). Wei Zhang Decl. Ex. 2, at 40, 43 (doc. 29-2). Stated differently, the record evinces that CSL began storing the Portland Shipment as a service to SFI as contemplated by the tariff.

In sum, CSL has established a contractual entitlement to demurrage from June 2, 2018, the date demurrage charges began to run on the cargo, through January 8, 2020, the date SFI took possession of the cargo. See OOCL (USA) Inc. v. Transco Shipping Corp., 2015 WL 9460565, *6 (S.D. N.Y. Dec. 23, 2015) (consignee was bound by terms of tariff and bill of lading and therefore liable for "breach[ing] each bill of lading by failing to pay demurrage"). The amount of compensation owed to CSL during this time is established by its tariff, which provides that, for every day the cargo remains unclaimed after the expiration of free time, SFI will be assessed a

predetermined amount of demurrage. See Yang Ming, 259 F.3d at 1093 (carrier "is expressly prohibited by statute from charging demurrage rates greater or less than the demurrage rates listed in its tariff" and a shipper is "conclusively presumed" to consent to the terms of a published tariff) (citations omitted).

## II. Failure to Mitigate

"[A] nonbreaching party to a contract has a duty to take reasonable steps to mitigate its damages, and that its failure to do so may prevent it from recovering damages that otherwise could have been avoided." Id. at 1095 (citation omitted). Thus, "a party may be required to make expenditures if the expenditures are small in comparison to the possible losses" and "[d]amages will not be decreased if it is only shown that a substantial expenditure would have minimized the total loss." Id. (internal quotations, brackets, ellipses, and emphasis omitted).

Here, SFI's failure to mitigate argument is well-taken. After thoroughly evaluating the record, the Court finds that both sides to this dispute adopted intransigent and, ultimately, ineffectual positions. SFI refused to pay the $6,360.61 in transloading and container damage charges because, in its view, CSL's negligence was the cause of the rollover accident and CSL had otherwise been engaging in "illegitimate and inequitable conduct." Shelter Forest Int'l Acquisition, 2020 WL 4340979 at *7-9, 15 (citation and internal quotations omitted). CSL, in contrast, chose not to release the Portland Shipment and began charging demurrage, despite evidence produced by SFI indicating that its improper blocking did not cause the rollover accident.

When faced with pressure from CSL, SFI did not choose to immediately pay the charges, then sue CSL or bond out the cargo, but instead left the Portland Shipment under seizure and employed self-help measures by "withholding payment on another shipment, as a means of a partial offset of its losses due to CSL's alleged breaches regarding the Portland and Chippewa

Page 13 – OPINION AND ORDER

Falls Shipments." Id. at *9 (citation and internal quotations and brackets omitted). SFI, in turn, suspended CSL's credit terms in accordance with the Service Contract. Id.

Even after SFI paid the transloading and container damage charges in March 2019, CSL continued to store the Portland Shipment for another 10 months, knowing that demurrage was increasing exponentially by the day (a decision presumably related, at least in part, to the filing of this lawsuit in July 2019). The consequences of such a choice could be financially disastrous to SFI – i.e., incurring a $160,930 penalty for resisting a $6,360.61 carrier charge.

Significantly, CSL does not dispute SFI's evidence demonstrating that the parties had agreed SFI would take possession of the Portland Shipment "without concurrent payment of the demurrage" after furnishing the $6,360.61 in disputed charges. Loe Decl. ¶ 10 (doc. 82). CSL also does not dispute that it then chose to renege on that agreement. See generally CSL's Reply to Mot. Summ. J. (doc. 84); see also Justice v. Rockwell Collins, Inc., 117 F.Supp.3d 1119, 1134 (D. Or. 2015), aff'd, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted).

As such, the Court cannot conclude that either party is the innocent victim of the other's business dealings. The fact remains, however, that CSL had a duty to employ reasonable measures to limit its damages, a duty which it failed to appropriately discharge (even assuming the lesser "range of reason" standard governs). This duty began on March 15, 2019, when SFI was ready and willing to pay the disputed transloading and container charges and retrieve its cargo.[8] See Orient

---

[8] Indeed, CSL made no effort to minimize its damages, even after SFI attempted to pay the disputed charges (or subsequently filed this lawsuit premised, in part, on the alleged wrongfulness of SFI's actions related to the Portland Shipment), instead adopting a hard line on demurrage by maintaining possession of the cargo. As denoted above, CSL's briefs are silent concerning why it

Page 14 – OPINION AND ORDER

Overseas Container Line Ltd. v. Crystal Cove Seafood Corp., 2012 WL 463927, *14 (S.D. N.Y. Feb. 14, 2012) (carrier has an "obligation to mitigate its damages [even] where shipper failed to pick up cargo") (citations omitted); see also Cross Equip., Ltd. v. Hyundai Merch. Marine Am., Inc., 1999 WL 38378, *3-4 (E.D. La. Jan. 22, 1999) (the assessment of "a $215,755.10 charge, for three months of demurrage . . . against a party for having refused to pay initially $8,000" was "an absurd legal result and would not comport with this Court's notion of justice," despite both parties having engaged in unwise "hardball-type business decisions"); Yang Ming, 259 F.3d at 1093 (carrier entitled to demurrage under its tariff from when free time lapsed until the cargo was abandoned; the following period did not qualify for demurrage because the merchant "cannot be said to have benefitted from such storage").

    As a result of CSL's failure to mitigate, the Court finds that a reduction of the period of demurrage is warranted. CSL's damages are therefore limited to June 2, 2018, through March 15, 2019. In accordance with the rates set forth in CSL's published tariff, CSL's reasonable damages total $78,705 (i.e., 4 days at $220 per day ($880) + 283 days at $275 per day ($77,825)). Wei Zhang Decl. Ex. 1, at 16 (doc. 29-1); Second Wei Zhang Decl. ¶¶ 4-5 & Ex. A (doc. 70).

## CONCLUSION

    For the reasons stated herein, CSL's Motion for Summary Judgment on Remaining Demurrage Claim (doc. 69) is granted as to liability and judgment shall be entered awarding

---

chose to repudiate its agreement to release the cargo on March 15, 2019, without the payment of demurrage. In any event, the Court notes that SFI ultimately took possession of the Portland Shipment without the payment of demurrage, such that no change in circumstance occurred between March 15, 2019, and January 8, 2020, to justify CSL's continued storage of SFI's cargo beyond this date, at which point it was clear that SFI did not intend on paying demurrage absent a court order.

damages in accordance with this Opinion and Order. Attorney fees shall not be included in this judgment; rather, CSL and SFI shall attempt to reach an amicable agreement as to the proper amount of and entitlement to attorney fees and costs within 10 days of date of entry of judgment, failing which CSL shall file a timely motion for attorney fees and costs under Fed. R. Civ. P. 54(d). SFI's request for oral argument is denied as unnecessary.

IT IS SO ORDERED.

DATED this 6th day of January, 2021.

_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge